## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**RUTH WILCOX**

     Plaintiff,

v.

**SERVIS ONE, INC. d/b/a BSI**
**FINANCIAL SERVICES**

AND

**WILMINGTON SAVINGS FUND**
**SOCIETY, FSB, NOT IN ITS**
**INDIVIDUAL CAPACITY BUT SOLELY**
**AS TRUSTEE FOR BROUGHAM**
**FUND I TRUST**

AND

**EXPERIAN INFORMATION**
**SOLUTIONS, INC.**

AND

**EQUIFAX INFORMATION**
**SERVICES, LLC**

AND

**TRANS UNION, LLC**

     Defendants

Case No. _____19-2535_____


**REQUEST FOR JURY TRIAL**

## COMPLAINT

Plaintiff Ruth Wilcox ("Ms. Wilcox" or "Plaintiff"), through her undersigned counsel

Phillip Robinson and the Consumer Law Center LLC, hereby files this Complaint and Jury

Demand against Defendants Servis One, Inc. d/b/a BSI Financial Services ("BSI"), Wilmington

Savings Fund Society, FSB, not in its Individual Capacity but Solely as Trustee for Brougham

18

Fund I Trust ("Brougham"), Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), and Trans Union LLC ("Trans Union")(collectively "Defendants"), and says in support:

## INTRODUCTORY FACTUAL BACKGROUND

1.    The underlying matter involves just one of hundreds of other similar situations across the State where, through no fault of their own, homeowners are wrongfully threatened by knowing and willful mortgage servicing practices which misrepresent, misstate, and/or omit the true facts concerning the actual status of a consumer's loan.  In these instances, such as the underlying matter involving BSI and Brougham, the servicer/lender place their interest above that of the consumer homeowner, i.e. Wilcox, and unfairly and deceptively ignores its legal, statutory and contractual duties including those agreed to as part of its license or charter to legally operate.

2.    These practices are compounded when homeowners, like Ms. Wilcox in this case, try in good faith to resolve the situation but the servicer/lender, i.e. BSI and Brougham, ignores the credible, undisputed facts and instead rely upon their own incomplete and knowingly false records, fully intending to ignore the serious and material issues at stake and willfully blind itself to true status of the mortgage loan. After their reasonable efforts to mitigate their mortgage situations are ignored, homeowners like the Plaintiff, are left with no other option but to seek the assistance of the courts.

3.    Here, BSI and each of the credit reporting agency defendants, i.e. Trans Union, Equifax, and Experian ("CRAs"), also failed to reinvestigate the Plaintiff's disputes as required by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA") and each refused to

correct and failed to correct their files on Plaintiff.  Each of the CRAs and BSI continued to report inaccurate information concerning Ms. Wilcox and failed to report that the information is disputed by Ms. Wilcox.  Ms. Wilcox continues to suffer damages as the direct result of the CRAs' and BSI's violation of the FCRA.

4.     The computerization of our society has resulted in a significant increase in data concerning individual American citizens. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to be exchanged instantaneously to requesting parties. Such timely information is intended to lead to faster, more accurate, and improved services by its recipients.

5.     However, in circumstances like this matter the data exchanged and provided by the CRAs to others is often inaccurate and the CRAs do not have adequate procedures in place to reasonably investigate disputes and avoid the incorrect information reported by them from being misused and misinterpreted.  Individual consumers, like Ms. Wilcox, can sustain substantial harm, both emotionally and economically, whenever inaccurate or fraudulent information is disseminated and/or obtained about them from the CRAs and BSI through the CRAs.

6.     The CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers and similar interested  parties)  information,  commonly called "consumer reports," concerning individuals who may be applying for retail credit, for the lease of an apartment, for a car or mortgage loan, for employment or the like.

7.     Since 1970, when Congress enacted the FCRA, federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of

the personal, private and financial information that they compile and sell about individual consumers.

8. Requiring CRAs to assure the "maximum possible accuracy" of consumer information is crucial to the stability of our banking system, to wit:

> The banking system is dependent upon fair and accurate credit reporting.
>
> Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

9. To further the primary goal of greater accuracy, the FCRA requires BSI, Trans Union, Equifax, and Experian to conduct "reasonable investigations" into disputes lodged to CRAs by consumers claiming to have inaccurate or incomplete information appearing in their credit reports, to correct or update any such errors or omissions, and to report back to the consumers the results of their investigations.

10. The subject practices involved in this action include: (i) BSI's improper demand for more monies (and failing to properly account for other monies received) than were due and owing with the intent that Ms. Wilcox and others involved in the mortgage lending process, including the CRAs, rely upon its unfair or deceptive demands; (ii) BSI's inadequate responses to Ms. Wilcox' inquiries required under State and Federal law with the intent that Ms. Wilcox would rely upon its false and misleading responses and omissions; and (iii) BSI's improper threats of collection activities, with the intent that Ms. Wilcox would pay it more sums not actually due from her, when BSI unfairly and deceptively declared a fictional default and Ms. Wilcox was in fact current on her mortgage obligation.

11.   Had BSI been able to perform the basic services required of a mortgage servicer/lender and furnisher of accurate credit information to the CRAs in timely collecting, posting and crediting the payments made by Ms. Wilcox, or responding truthfully and accurately to Ms. Wilcox in the servicing of her loan, or even conducted a bona fide investigation when Ms. Wilcox requested it to do so, Ms. Wilcox would not have suffered the damages and losses described herein that are the direct and proximate result of BSI's misrepresentations, misstatements, omissions, and otherwise unfair and deceptive actions.

12.   Ms. Wilcox's damages and losses proximately caused by BSI include: (i) costs incurred to make bona fide inquiries to BSI which were simply ignored or not responded to truthfully, (ii) fees and expenses added to Ms. Wilcox' mortgage account and collected by BSI and Brougham which were not due and owing since she is not in default or past due on her mortgage obligation and not otherwise authorized, and which were prohibited by a prior agreement between the parties, (iii) false and incorrect reporting to third parties that Ms. Wilcox is delinquent or in default on her mortgage loan, (iv) sums retained by BSI that it demanded from Ms. Wilcox and which it applied to sums that were not lawfully owed; and (v) significant emotional damages, with physical manifestations such as anxiety, stress, frustration, anger, and fear, from being wrongfully threatened with debt collection, improper mortgage servicing, and/or threatened foreclosure and prevented from enjoying the benefit of homeownership and risk-free sale of her home (which is her right) without having to pay more than the true sums she might owe.

13.   This action also seeks compensatory, statutory, and punitive damages, costs and reasonable attorneys' fees for Plaintiff against the Defendant CRAs for their willful and/or negligent violations of the Fair Credit Reporting Act.

14.     As a licensed, Maryland mortgage servicer/lender BSI knowingly agreed to "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan." MD. CODE REGS. 09.03.06.20.  Ms. Wilcox is an intended third-party beneficiary of this duty.

15.     Mortgage servicers are required under the Real Estate Settlement Procedures Act to reevaluate each borrower's escrow account on an annual basis.  12 U.S.C. § 2609(c).  An "escrow account analysis" means the accounting that a servicer conducts to determine: (1) the appropriate target balances for the escrow items (e.g., taxes, insurance) to be paid under the account; (2) the borrower's monthly escrow payments for the upcoming twelve-month period; and (3) whether any surpluses, shortages, and deficiencies exist.  The servicer may also require a "cushion" on the account which may not exceed an amount equal to one-sixth of the total disbursements for the year (the equivalent of two months of escrow payments). RESPA does not require the use of a cushion, and servicers may use a smaller cushion than allowed by RESPA.  Reg. X, 12 C.F.R. § 1024.17(d).

16.     The requirements of RESPA and state law, including COM. LAW § 12-109, are integral to and included in the standard mortgage documents governing the relationship between the Escrow Class members and the Defendants.  In Ms. Wilcox's Deed of Trust for example, it provides standard language as follows related to the calculations required under RESPA:

> Lender may, at any time, collect Funds in an amount (a) sufficient to permit Lender to apply Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

23

Wilcox DOT (Book 17522, Page 751) at ¶ 3. *See also Id.* at ¶ Q (definition of RESPA).

17. BSI is only permitted "to maintain a cushion no greater than one-sixth ($^1/_6$) of the estimated **total annual payments** from the account" (emphasis added). 12 C.F.R. § 1024.17(c)(1)(ii). *See also* 12 U.S.C.A. § 2609(a)(1)(limiting the required deposits to an escrow account to no more than the sums necessary to make the required payments in the "ensuing twelve-month period"); 12 U.S.C.A. § 2609(a)(2)(permitting BSI to require a cushion in excess of one sixth of the total annual payments required from the escrow account if the account is projected to have a "deficiency" during the 12 month period). The term deficiency, however, is not defined in 12 U.S.C.A. § 2609. 12 C.F.R § 1024.17(b) does define "deficiency" as "the amount of a negative balance in an escrow account." Plaintiff's annual escrow account projections never forecasted any deficiency covered by 12 C.F.R § 1024.17(b) but BSI still claimed a deficiency and demanded excess sums due from them beyond the maximum cushion permitted under RESPA.

18. BSI, on behalf of Brougham and with Brougham's express authorization, has unfairly and by requiring and demanding unauthorized surpluses from Plaintiff's mortgage account in excess of the sums permitted by the requirements of RESPA which is an integral part of the standard contracts governing the relationship of the Defendants on the one hand and Plaintiff on the other hand related to what sums are required for Escrow Accounts.

**THE PARTIES**

19. During the times relevant and material to this Complaint, Ms. Wilcox was a resident of Hanover, Maryland in Anne Arundel County. Her loan subject to these proceedings is a consumer loan. It is a loan primarily for personal, family or household purposes.

24

20.   BSI is a privately held corporation of BSI Financial Holdings, Inc. a Delaware Corporation. As part of its business, BSI authorizes its agents to conduct collection activities in every Maryland County.  BSI is a licensed Maryland mortgage lender/servicer and has agreed as material term of that license to a duty of good faith and fair dealing with Maryland mortgage borrowers like Ms. Wilcox.

21.   Brougham is the owner of Ms. Wilcox's loan.  Brougham requires that BSI service its agreement with Ms. Wilcox in accordance with Maryland law and is responsible for the acts of its authorized servicer BSI.

22.   Defendant Equifax Information Services, LLC ("Equifax") is, upon information and belief, a Georgia limited liability company with its principal place of business at 1550 Peachtree Street, NW, Atlanta, Georgia; is registered to do business in Maryland (SDAT ID: Z06334684); and is licensed by Maryland as a Consumer Reporting Agency.

23.   Defendant Trans Union, LLC ("Trans Union") is, upon information and belief, a Delaware limited liability company with its principal place of business at 1013 Centre Road, Wilmington, Delaware; is registered to do business in Maryland (SDAT ID:  Z05199849); and is licensed by Maryland as a Consumer Reporting Agency.

24.   Defendant Experian Information Solutions, Inc. ("Experian") is, upon information and belief, an Ohio corporation with its principal place of business at 505 City Parkway West, Orange, California; is registered to do business in Maryland (SDAT ID:  F04510434); and licensed by Maryland as a Consumer Reporting Agency.

25.   Not named as a party to this action, Bizhan Beiramee ("Mr. Beiramee") is a Maryland licensed attorney who has communicated with Ms. Wilcox on behalf of BSI and her prior

mortgage servicer Statebridge Company, LLC ("Statebridge") from his Montgomery County office.

## JURISDICTION AND VENUE

26. This Court has jurisdiction of this matter based upon (i) federal question jurisdiction (28 U.S.C. § 1331) and (ii) supplemental jurisdiction (28 U.S.C. § 1367(a)).

27. This Court also has jurisdiction pursuant to 28 U.S.C.A. 1332 since the parties are residents of different states and the amount in controversy exceeds $75,000.00.

28. Venue in this Court is proper in that the Defendants transact business within Maryland in relation to Maryland residents as part of their debt collection/mortgage servicing practices and credit reporting business and includes conduct complained of which occurred in Anne Arundel County, Maryland.

## ADDITIONAL FACTS RELATED TO MS. WILCOX & DEFENDANTS

### A. BACKGROUND ON THE RELEVANT FACTS RELATED TO THE PLAINTIFF'S MORTGAGE LOAN

29. BSI acted as the mortgage servicer for Ms. Wilcox's mortgage loan which was owned by Brougham during the periods of time relevant and material to this Complaint.  It became the servicer of her loan effective October 25, 2016 as declared by BSI to her in a Notice of Servicing Transfer letter dated November 8, 2016 which BSI intended Ms. Wilcox to rely upon.

30. On or about the date of servicing transfer, BSI boarded Statebridge's records for Ms. Wilcox's loan into its systems.  This is a uniform process used by BSI for all servicing

portfolios it acquires and includes the transfer of all loan documents such as the mortgage note and all modifications and record of payments and credits to Ms. Wilcox's account (as well as the accounts of other mortgage borrowers).

31.     Brougham acquired ownership of Ms. Wilcox's mortgage loan on October 25, 2016 from Wilmington Savings Fund Society, FSB, not in its Individual Capacity but solely as trustee for PrimeStar-H Fund I Trust ("PrimeStar").  This acquisition is reflected on a standard and uniform recorded Assignment of Deed of Trust in the land records of Anne Arundel County, Maryland (Book 30336, Page 367) which indicates Ms. Wilcox's Deed of Trust "[t]ogether with the note(s) and obligations therein described or referred to, the money due and to become due thereon, with interest" were granted, sold, transferred and conveyed, without recourse, to Brougham.

32.     Ms. Wilcox previously brought an action against BSI and Brougham related to the loan. That action was resolved by a settlement agreement between the parties effective September 1, 2018 ("Settlement Agreement"). Ms. Wilcox is not relitigating here any of the prior claims or issues brought by her in the prior action but is seeking relief in this action based on BSI's and Brougham's breach of their Settlement Agreement with Ms. Wilcox resolving the prior disputes.

33.     As part of the Settlement Agreement, BSI, Brougham, and Wilcox agreed to the following terms relating to Ms. Wilcox' loan:

  a.   The principal balance of the loan would be reduced by $20,000.00, for a new principal balance of $289,114.26 as of September 1, 2018;

  b.   The principal and interest payments would remain at $1,201.26;

27

    c.  The escrow portion (which was subject to changes if necessary due to increased or reduced taxes or insurance on the Property) would be $260.96;

    d.  The starting escrow balance as of September 1, 2018 was $89.90;

    e.  All other aspects of the loan (such as the maturity date and interest rate) would remain unchanged; and

    f.  Each party would bear their own costs and attorney fees related to the prior action.

34.    BSI, Brougham, and Ms. Wilcox each signed and agreed to the express terms and conditions of the Settlement Agreement.

35.    At the conclusion of the prior action (Case No. 8:18-cv-00813), this Court also entered a Local Rule 111 Order which indicated that each party was to bear its own costs.

36.    In reliance to the Settlement Agreement and this Court's Rule 111 Order, Ms. Wilcox continued to make each payment due on the loan in accordance with the Settlement Agreement effective September 1, 2018 as follows:

| Payment Month | Payment Amount | Payment Date |
|---|---|---|
| September 2018 | $1,462.22 | August 30, 2018 |
| October 2018 | $1,462.22 | October 4, 2018 |
| November 2018 | $1,462.22 | November 2, 2018 |
| December 2018 | $1,462.22 | December 4, 2018 |
| January 2019 | $1,462.22 | January 2, 2019 |
| February 2019 | $1,462.22 | February 1, 2019 |

| March 2019 | $1,425.45 | March 11, 2019 |
| April 2019 | $1,425.45 | April 2, 2019 |
| May 2019 | $1,425.45 | May 3, 2019 |
| June 2019 | $1,425.45 | June 3, 2019 |
| July 2019 | $1,425.45 | July 1, 2019 |
| August 2019 | $1,425.45 | July 29, 2019 |

37.    The first monthly statements issued by Defendant BSI on behalf of Brougham following the Settlement Agreement (issued on September 1, 2018 and October 4, 2018) were generally correct and reflected the terms agreed to in the parties' Settlement Agreement. However, despite Ms. Wilcox' reasonable reliance on the Settlement Agreement between her and Defendants BSI and Brougham, and her reasonable expectation that as professional mortgage actors Defendants BSI and Brougham would competently and accurately handle her mortgage loan, each of the statements issued by BSI after October 4, 2018 contained inaccurate and misleading information, and further represented that Ms. Wilcox was required to pay sums not incurred or agreed to by the parties in the Settlement Agreement or the loan documents governing her loan.

38.    Specifically, BSI on behalf of Brougham issued a statement on November 2, 2018 which represented that in addition to the principal, interest and escrow payment due from Ms. Wilcox, additional fees and costs had been assessed to her loan in the total amount of

29

$10,270.00 for "BKY Fees" and "BKY Costs." BSI's statement represented that these additional sums should be included in Ms. Wilcox' next payment.

39. Ms. Wilcox continued making her regular monthly payments as identified in ¶ 36 *supra* in reliance that Defendants BSI and Brougham would appropriately apply the payments in accordance with the Settlement Agreement and documents governing the loan terms.

40. On January 24, 2019, BSI, on behalf of Brougham, issued and sent to Ms. Wilcox a knowingly false and deceptive escrow disclosure, which it intended for Ms. Wilcox to rely upon, which identified (i) the sums it claimed had been made and disbursed to pay for the taxes and homeowner's insurance for the Property from March 1, 2018 through February 28, 2019; and (ii) the sums it claimed were anticipated to be made and disbursed to pay for the taxes and homeowner's insurance for the Property from March 1, 2019 through February 29, 2020. BSI's January 24, 2019 escrow statement made the following misrepresentations and misstatements:

 a. BSI represented that it had not received Ms. Wilcox' February 2019 escrow payment, and even though this payment was not yet due (and even though BSI received the payment on February 1, 2019), represented that it was able to construct a complete and accurate escrow analysis without including that sum which was not even due at the time of the escrow analysis; in other words, BSI's unfair, deceptive, and abusive escrow analysis assumed (incorrectly) that Ms. Wilcox would not make her timely February 2019 payment when it was actually due when BSI had no reasonable basis to make such a conclusion.

 b. BSI represented that the anticipated taxes which would be owed for the property was $2,496.07, when in fact the county taxes owed the prior year (on which BSI's

30

calculation was supposed to have been based) was only $1,536.72 and no indication had been made by any government agency that the property taxes would increase by nearly $1,000.00.

    c.  Because of BSI's incorrect and overstated anticipated disbursements and incorrect starting balance, it inaccurately calculated the sum of Ms. Wilcox's future escrow payments.

    d.  Because of BSI's incorrect escrow calculations, it further compounded its errors by incorrectly calculating the correct escrow cushion for Ms. Wilcox's loan.

41.    Ms. Wilcox was frustrated and upset that despite Defendant BSI's and Brougham's status as mortgage professionals, she still had to monitor their handling of her loan since they were apparently incapable of doing so themselves.   In reliance to their unlawful and incorrect demands, she wrote, on or about March 4, 2019 a Qualified Written Request/Notice of Error ("QWR/NOE I") letter to BSI at the address designated by it to accept such communications.

42.    BSI received Ms. Wilcox's QWR/NOE I.

43.    In her QWR/NOE I, Ms. Wilcox identified for BSI each of the issues with its escrow accounting identified *supra*, and also requested that BSI identify and remove the $10,270.00 it claimed was due from her but was never agreed to as part of the Settlement Agreement, this Court's prior Rule 111 Order in the previous case, and the Loan documents governing her relationship with BSI and Brougham. Ms. Wilcox also provided BSI the correct calculations related to her escrow amount that she should pay each month, which totaled approximately $224.19, and informed BSI that she would be tendering this correct sum in addition to her principal and interest payment rather than BSI's incorrect escrow

31

calculation demanded by BSI without the right to do so based upon its reckless mortgage servicing practices.

44. BSI responded partially to Ms. Wilcox's QWR/NOE I on April 15, 2019 by sending her a partially corrected escrow analysis statement which indicated that it had miscalculated its initial analysis, and issued her a refund check in the amount of $578.58; however, BSI failed to respond (and otherwise ignored) to Ms. Wilcox' other inquiries and notice of errors in her QWR/NOE I related to the $10,270.00 in purported fees it had added to her loan without the right to do so. In addition, BSI affirmed its initial escrow miscalculation by indicating that Ms. Wilcox should have paid the wrong escrow sum for the months of March, April and May 2019.  In other words, instead of correcting its errors completely it ratified the errors and represented to Ms. Wilcox, with the intent that she rely upon its representation, that she was required to pay prior disclosed escrow sums it knew were false, misstatements, and otherwise wrong.

45. BSI's April 15, 2019 response indicated that it had not performed a reasonable investigation into Ms. Wilcox's QWR/NOE I because (i) BSI did not respond whatsoever to Ms. Wilcox' inquiry regarding the additional $10,270.00 in fees that were added to her account; and (ii) BSI affirmed and compounded its errors from its prior escrow analysis by not correcting its errors retroactively and instead ratified its own errors to its benefit without the right to do so.

46. Because BSI failed to perform a reasonable investigation or respond to her initial letter and had otherwise compounded its prior errors, Ms. Wilcox sent it another Qualified Written Request/Notice of Error letter on or about April 29, 2019 ("QWR/NOE II") to request once again that BSI identify the source of the $10,270.00 claimed due from her that added to her

32

loan without any basis (and to remove the claimed sum), and to point out that the purported escrow refund check it had issued (which Ms. Wilcox voided returned with this letter) was not the full amount she was owed by BSI's unfair, abusive, and deceptive servicing practices.

47.     Ms. Wilcox sent the QWR/NOE II to address published by BSI for such correspondence. BSI received QWR/NOE II.

48.     BSI provided a response to Ms. Wilcox's QWR/NOE II on June 14, 2019 through a letter from its authorized employee Megan Porcenaluk. BSI explained in that response that it disagreed with Ms. Wilcox's analysis of the escrow account, and responded that the refunded escrow check which Ms. Wilcox had refused would remain in her account. In response to Ms. Wilcox's notice of error regarding the $10,270.00 in fees improperly added to her account, BSI responded by admitting that it breached the Settlement Agreement and was imposing its own costs and attorney fees incurred in the prior action onto Ms. Wilcox's mortgage account even though it had no right to do so pursuant to the terms of the Settlement Agreement and the Rule 111 Order entered by the Court.  It also provided copies of invoices to it and its predecessor Statebridge had it had purported received from its own attorney—i.e. Mr. Beiramee—relating to the prior action previously resolved between the parties; in other words BSI knowingly admitted to imposing upon Ms. Wilcox's mortgage account the attorney fees it incurred in the prior action when it had no right to do so. As described *supra*, one of the terms of the Settlement Agreement between Ms. Wilcox and Defendants BSI and Brougham was that each party would bear its own costs and attorney fees. So, BSI knew it could not pass its own attorney fees onto Ms. Wilcox but did so anyway with the intention that she rely upon its representation.

49. Had BSI performed a reasonable investigation into Ms. Wilcox' QWR/NOE II, it would have realized that demanding these sums from Ms. Wilcox was a material breach of the Settlement Agreement and would have removed them from her account and stopped demanding the sums from her. However, BSI did not perform a reasonable investigation, and refused to remove the $10,270.00 it wrongly claimed was owed by Ms. Wilcox. In fact, BSI on behalf of Brougham and with Brougham's express authority, affirmatively demanded that Ms. Wilcox pay this sum in each of its statements on and subsequent to November 2, 2018, including December 4, 2018; January 2, 2019; February 1, 2019; March 18, 2019; April 2, 2019; May 3, 2019; June 3, 2018; July 1, 2019; and August 16 2019.

50. As described *supra* in ¶ 43, Ms. Wilcox had informed BSI on February 15, 2019 what the correct escrow, principal and interest payment should be from March 2019 through February 2020 (i.e., $224.19 + $1,201.26, or $1,425.45) and timely tendered that sum to BSI each month thereafter. Even though BSI later acknowledged that its original calculation was wrong (¶ 44), and the escrow payments should be just $222.22 (less than Ms. Wilcox' estimation), BSI still began claiming that Ms. Wilcox had not tendered the entire payment to it and diverted portions of her payments to "unapplied" amounts which were not due, creating a fictional default. BSI initiated its improper diversions of Ms. Wilcox' payments starting with her March 11, 2019 payment and continued with each of her payments thereafter through the present.

51. BSI knew, or should have known as a so-called mortgage professional which regularly handles mortgages and escrow accounts, that when it discovered its escrow accounting error on April 15, 2019 that it had collected two of Ms. Wilcox' payments using its incorrect escrow analysis, and it should have corrected and adjusted its records. However,

34

BSI elected not to do so, and instead began to compound its error by sending Ms. Wilcox, with the intention that she rely upon them, unfair, deceptive, and otherwise abusive past due notices based on its fictional default. BSI sent these notices on March 17, 2019; April 17, 2019; May 17, 2019; June 18, 2019; July 17, 2019, and August 17, 2019.

52.     In furtherance of its material errors, BSI also began furnishing information to the CRA Defendants based on BSI's fictional default that falsely and knowingly misstated that Ms. Wilcox was delinquent on her monthly mortgage payments; and also incorrectly identified the amount of her payments and sums lawfully due from her. Specifically, BSI began furnishing information that Ms. Wilcox was late on her payments starting in March 2019 going forward, and that the amount of her monthly payments was $1,502 (this was the amount BSI initially claimed due based on its erroneous escrow analysis, which it acknowledged was incorrect) and that her loan balance included its own attorney fees and costs charged in the prior action that it had agreed in the Settlement Agreement and this Court's prior Order were its own costs.

53.     As a matter of federal law, BSI was prohibited from making the reports to the CRAs in March 2019, April 2019, May 2019, and June 2019 because it had received Ms. Wilcox's QWR/NOE I and QWR/NOE II which required BSI to suppress any further, disputed reporting for a period of at least sixty days.  *See e.g.* 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

54.     Upon learning of BSI's furnishing of negative and inaccurate information to her consumer reports, Ms. Wilcox also promptly wrote dispute letters pursuant to the Fair Credit Reporting Act to Experian, Equifax and Trans Union to dispute the incorrect information. Ms. Wilcox also included in her dispute her prior qualified written request and BSI's letter

35

correcting its escrow analysis. Each credit bureau received Ms. Wilcox' dispute (Trans Union on June 7, 2019; Experian on June 8, 2019l and Equifax on June 9, 2019), and pursuant to their duties under the FCRA forwarded that information to BSI as the furnisher of the information in dispute.

55.  After receiving Ms. Wilcox' disputes, despite being aware that the fictional default was entirely due to its incorrect escrow analysis and application of payments; and despite being further aware that it had already admitted that its initial escrow analysis was wrong, and that Ms. Wilcox' payments were $1,423.48, BSI conducted an unreasonable investigation into the dispute by refusing to even consider the terms and conditions of Settlement Agreement and actual information in its own possession.  Instead it confirmed to each of the CRA defendants the same incorrect information identified in ¶ 53. BSI's investigation was unreasonable since it failed to review the terms of the Settlement Agreement, its own prior admissions, and the actual issues raised by Ms. Wilcox.  In addition, its willfulness was further demonstrated by the fact that it knew its electronic systems were defective and otherwise subject to material errors as it agreed to in a Consent Order with the Consumer Financial Protection Bureau (CFPB) the previous month in which the CFPB found that BSI violated the Consumer Financial Protection Act of 2010, the Real Estate Settlement Procedures Act, or the Truth in Lending Act by:

a.  Handling mortgage servicing transfers with incomplete or inaccurate loss mitigation information. This resulted in failures to recognize transferred mortgage loans with pending loss mitigation applications, in-process loan modifications, and permanent loan modifications;

b.  Handling mortgage servicing transfers with incomplete or inaccurate escrow information resulting in untimely escrow disbursements;

c.  Inadequately overseeing service providers, resulting in untimely escrow disbursements to pay borrowers' property taxes and homeowners' insurance premiums;

d.  Failing to promptly enter interest rate adjustment loan data for adjustable rate mortgage (ARM) loans into its servicing system, resulting in BSI sending monthly statements to consumers that sought to collect inaccurate principal and interest payments; and

e.  Maintaining an inadequate document management system that prevented BSI's personnel or consumers from readily obtaining accurate information about mortgage loans.

56.  In response to the false and incorrect information reported by BSI to each of the CRA Defendants (Trans Union, Equifax, and Experian) summarized above, Ms. Wilcox's FCRA dispute letters to each CRA requested that they perform a reasonable investigation of the dispute and remove the derogatory, false information provided by BSI to them.  In support of this correspondence Ms. Wilcox provided the CRAs with sufficient information to verify that the reporting was incorrect.  In addition, as a matter of public record each CRA Defendant was aware of the Consent Order.

57.  Each of the Defendant CRAs received copies of the disputes acknowledged in the preceding paragraph and therefore had knowledge of the issues.  Each responded as follows:

a.  On June 21, 2019, Experian responded to Ms. Wilcox and stated as follows: "Outcome: Updated – information on this item has been updated." However, no changes were made by Experian to the BSI payment history reported related to Ms. Wilcox's loan.

b.  On July 8, 2019, Equifax responded to Ms. Wilcox and stated as follows: "We have researched the credit account….The results are: This creditor has verified to OUR company that the balance is being reported correctly. This creditor has verified to OUR company that the current status is being reported correctly." Equifax represented that additional and historical information had been updated, but no changes were made by Equifax to the BSI payment history reported related to Ms. Wilcox's loan.

c.  On June 18, 2019, Trans Union responded Ms. Wilcox and stated as follows: "We investigated the information you disputed and undated: Balance; Date Updated; Law Payment Made; Past Due; Rating." However, no changes were made by Trans Union to the BSI payment history reported related to Ms. Wilcox's loan.

58.  Based on the Defendant CRAs' responses summarized in the preceding paragraph, neither performed a reasonable investigation since each apparently failed to read and evaluate the disputes sent to them and failed to take any other steps other than to re-report the same false information provided to them by BSI.  Upon information and belief each CRA Defendant's contractual relationship with BSI unfairly and deceptively infects its ability to conduct a reasonable investigation by contacting consumers or the furnisher to confirm what it is reporting because each profits from the information it reports to others.  In other words each CRA defendant is more concerned with the profits it received from the data it collects rather than the accuracy of the data.  Neither CRA conducted asked any follow-up

questions before re-reporting the false information.   Because of their financial relationship with BSI, each Defendant CRA also disregarded the findings of the Consent Order entered into between BSI and the CFPB which demonstrated the integrity of the data provided by BSI to them is significantly inaccurate.

59.     Each Defendant CRA is also aware of the special and higher importance of accurate reporting related to mortgages on a consumer's credit report.  Because of this heightened awareness, the CRA Defendants failure to ask a single follow-up inquiry of BSI or even MS. Wilcox and ignore the findings of the CFPB in the public Consent Order, in response to her detailed dispute letter's and BSI's generic responses, demonstrates the unreasonableness of their own, independent investigations.

60.     So, from the CRAs' experiences related to the importance of accurate mortgage reporting as to the credit worthiness of a consumer, the Defendants' responses summarized in ¶ 56 and in response to Ms. Wilcox's disputes show that the each of the CRA Defendants unreasonably disregarded the details of Ms. Wilcox's disputes and knowingly and willfully failed to reasonably investigate the false, negative information given to them by BSI.

61.     No reasonable person would believe that a CRA would on the one hand disregard the terms of a Settlement Agreement against consumers by furnishers of credit information on various credit reports as part of their routine practices but simply disregard, as the CRA Defendants did here, the same Settlement Terms against the same furnishers of credit information and in favor of consumers like the Plaintiff.

62.     Each of the CRA Defendants have knowledge of facts and circumstances related to issues like those raised in this action from prior actions brought against them on a similar basis. Each of the CRA Defendants also have public knowledge of the CFPB's findings in the Consent Order.

63.     None of the CRA Defendants ever asked for any clarifications from Ms. Wilcox as to the dispute letter; nor did they ask BSI to provide to them any basis for the sums claimed due that were in conflict with the terms of the Settlement Agreement and other documents governing the relationship between Ms. Wilcox and BSI.  Further, none of the CRA Defendants ever considered findings available to them as a matter of record by the CFPB in the Consent Order which call into question the accuracy of data furnished by BSI. Instead, the CRA Defendants blindly, recklessly, and willfully accepted the same false, negative information provided to them by BSI.  Each of the CRAs also elected to knowingly continue reporting the same negative, false information.

64.     Ms. Wilcox has sustained damage to her reputation and standing in the community and otherwise have suffered emotional damages manifested by embarrassment, frustration, annoyance, and anger because she believed, in good faith, that the Settlement Agreement resolved the issues described herein related to the false, derogatory information submitted by BSI to the CRA Defendants; however, the CRA Defendants have simply ignored with reckless disregard their responsibilities to Ms. Wilcox's good faith notice of the issue before filing this action and the consequences of the CFPB's findings in the Consent Order to the data they re-report to others.

65.    Ms. Wilcox entered into a contract to sell her property on or about July 8, 2019 with a

closing date of August 26, 2019.  In preparation for the closing on the property, Ms. Wilcox

requested a payoff statement from BSI to determine the total sum she will be required to

tender to it. BSI provided Ms. Wilcox such a payoff statement, that it intended for her to

rely upon, which indicated the following:

a.   That Ms. Wilcox is required to pay $796.66 in interest, even though this amount is in

excess of the amount owed by her since she is current on her mortgage obligation;

b.   That Ms. Wilcox is required to pay $360.36 in purported late fees due to BSI's fictional

default and inability to correctly calculate the escrow sums owed on Ms. Wilcox' loan;

and

c.   That not only would Ms. Wilcox need to pay its own attorney fees not owed by her

from the prior action to satisfy the loan, but that BSI had already begun diverting

$1,197.02 from Ms. Wilcox' payments for that purpose, leaving the remaining sum of

$9,072.98 to be paid at Ms. Wilcox' settlement.

66.   To further prepare for the property sale, the title agent for the transaction—i.e. Sage Title

Group, LLC—requested a payoff statement from BSI which BSI provided to Sage Title by

facsimile on or about August 19, 2019 at 14:20:47 EDT.  BSI intended for Sage Title, Ms.

Wilcox, and the property purchasers to rely upon this payoff statement as part of the

mortgage lending process and transfer of the property.

67.   The payoff statement provided by BSI to Sage Title, as described in the previous paragraph,

was knowingly inaccurate, false, deceptive and otherwise abusive.  Specifically, it sought

unpaid fees, late charges, and other sums it was not entitled to demand or collect, directly

or indirectly, from Ms. Wilcox through the sale of the property or otherwise.  In addition,

41

BSI claimed Ms. Wilcox had not paid her August 2019 mortgage when she had already done so and its August 16, 2019 Statement to Ms. Wilcox admitted it had received on July 29, 2019.

68.   In order to not lose the contract on her house Ms. Wilcox was forced to pay the sums BSI admitted was for its and Brougham's attorney fees and costs in the prior matter but which it refused to remove from her account and it has no right to demand; and Ms. Wilcox was also forced to pay additional late fees and charges based on BSI's fictional default to close on the sale of her home.  As a result of BSI demanding and collecting through Sage Title, sums from Ms. Wilcox it was not entitled to collect on its behalf and on behalf of Brougham, Ms. Willcox is also damaged by the loss of the use of money she should have realized as a result of the property transfer.

69.   Further due to BSI's knowing, willful and inaccurate furnishing of information to the credit bureaus, Ms. Wilcox will be able to purchase a new home immediately after the sale of the current property because BSI has recklessly, willfully, unfairly, deceptively, and abusively claimed she has been past due since March 2019 when she has been current; and upon information and belief Ms. Wilcox will not be approved for credit, or will be approved for credit at a higher than market rate because of BSI's inaccurate furnishing of information relating to her former loan with is as described herein.

70.   By adding sums claimed to be due and owing from her on her loan, which are expressly prohibited under Maryland law and her loan documents as modified by the Settlement Agreement, BSI on behalf of Brougham abusively, unfairly, or deceptively altered the terms of Ms. Wilcox's loan without the right to do so and collected sums from Ms. Wilcox without the right to do so on the same basis.

71.  The material omissions, misstatements, misrepresentations, false statements and otherwise unfair, deceptive, and abusive acts and failure to conduct a reasonable investigation of Ms. Wilcox' disputes to BSI and the credit bureaus concerning the matters described above have caused actual damage to Ms. Wilcox.  These damages and losses, detailed herein, include out of pocket costs to communicate with BSI.

72.  Having nowhere else to turn for help, Ms. Wilcox is left to seek this Court's aid in preventing the injustice perpetrated by BSI and Brougham of illegally, unfairly and deceptively representing to Ms. Wilcox that she owes inaccurate, inflated amounts over and above the actual amount owed on the loan. These acts have damaged Ms. Wilcox by:

a.  The retention of approximately $10,270.00 in fees and costs apparently owed to the Defendants' attorney in the prior action which was explicitly not to be charged to Ms. Wilcox, but which Defendants represented to her was required to be paid by her in violation of the settlement agreement;

b.  Incurred Legal Fees to represent her at the settlement of the property;

c.  Bogus and invalid fees and costs charged to his mortgage account which were not just or proper given the circumstances;

d.  Postage and communications costs;

e.  Statutory damages;

f.  Emotional damages from stress, anxiety, fear, anger, frustration, headaches, and withdrawal from friends and family all proximately caused by the direct and indirect actions of BSI and Brougham.

**BSI, ON BEHALF OF BROUGHAM'S ADDITIONAL LEGAL DUTIES
RELATED TO THE SUBJECT OCCURRENCE**

43

73.   All persons, including licensed mortgage lender/servicers in the State of Maryland like BSI and Brougham, are expected to know the law. Charging and collecting unlawful fees and sums related to borrowers' accounts should not be permitted retain the profits from such activities.

74.   BSI has a duty pursuant to 15 U.S.C.A. § 1681s-2(a)(1) to "not furnish any information relating to a consumer to any consumer reporting agency if [it] knows or has reasonable cause to believe that the information is inaccurate."

75.   The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to a consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction. *Hoffman v. Stamper*, 385 Md. 1 (2005). This duty of care applies to BSI and Brougham as their work involves secured, consumer mortgage loans subject to Maryland laws.

76.   Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), BSI has duties to the Plaintiff to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605. Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), BSI is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law."  Pursuant to 12 C.F.R. § 1024.35(b)(5), BSI is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower."  It is unreasonable and a violation of its duties for BSI to demand

44

inaccurate sums due from Ms. Wilcox and it has no right to collect any sums from the Plaintiff which were barred by their prior settlement agreement.

77. The Maryland Mortgage Fraud Protection Act, MD. CODE ANN., REAL PROP. § 7-401, *et seq.*, establishes a statutory duty upon BSI to disclose to mortgage borrowers and homeowners, like the material information with respect to the mortgage lending process which includes those fees and costs which it is permitted to charge borrowers. *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 531 (D. Md. 2013); *Castle v. Capital One, N.A.*, No. CIV.A. WMN-13-1830, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014; *Stovall v. SunTrust Mortgage, Inc.*, No. CIV.A. RDB-10-2836, 2011 WL 4402680 (D. Md. Sept. 20, 2011).  In this case, BSI  has duties to disclose to the Plaintiff that it was barred by Maryland law from attempting to collect sums not owed after the terms of the written instruments agreed to by the parties.

78. BSI's and Brougham's knowledge is also represented by the standard and uniform Deed of Trust securing Brougham's interest in the home and Property of the Plaintiff.

79. 15 U.S.C.A. § 1639g provides: "A creditor or servicer of a home loan shall send an **accurate** payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower" (emphasis added).

80. In addition, 12 C.F.R. § 1026.36(c)(3) provides that: "Payoff statements. In connection with a consumer credit transaction secured by a consumer's dwelling, **a creditor, assignee or servicer, as applicable, must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date**. The statement shall be sent within a reasonable time, but in no case more

45

than seven business days, after receiving a written request from the consumer or any person acting on behalf of the consumer. When a creditor, assignee, or servicer, as applicable, is not able to provide the statement within seven business days of such a request because a loan is in bankruptcy or foreclosure, because the loan is a reverse mortgage or shared appreciation mortgage, or because of natural disasters or other similar circumstances, the payoff statement must be provided within a reasonable time" (emphasis added).

81.    By sending the Plaintiff knowingly inaccurate statements demanding sums not legally due BSI acted unlawfully, abusively, unfairly, deceptively, and with knowledge that it had no right to those sums claimed due and owing in violation of their duties in 15 U.S.C.A. § 1639g and 12 C.F.R. § 1026.36(c)(3).

82.    Under Maryland common law, BSI owes the Plaintiff, as discussed *infra*, a duty of care due to the 'intimate nexus' between the Plaintiff and BSI as a licensed real estate professional. This 'intimate nexus' arises from the relation of customers like the Plaintiff who relies upon the accuracy and honesty of the professional's services. *See 100 Investment Limited Partnership v. Columbia Town Center Title Co.*, 430 Md. 197 (2013); *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527 (1986).

83.    In July 2019 the CFPB issued a report, *Building a Bridge to Credit Visibility*, which explained disputed credit reporting can have material impact on vulnerable consumers.

> The ability to access credit is a critical component for families and individuals nationwide to have the opportunity to climb the economic ladder, exercise informed consumer choice, build wealth, and achieve economic stability. During this panel, a panelist representing UnidosUS, a Latino nonprofit organization, explained that access to credit can affect consumers' daily lives in many ways, and often means the difference between economic opportunity and fragility. According to this panelist, access to credit affects where consumers reside, work, and go to school; it may also have lasting generational effects.

46

*Id.* at Page 7.

84.    Previously the Board of Governors of the Federal Reserve System's 2007 "Report to

Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit"

explained:

> Inaccurate data may cause some consumers to pay more, or less, for credit
> than is warranted by their true circumstances. For the full benefits of the
> credit-reporting system to be realized, credit records must be reasonably
> complete and accurate. Yet, under the country's voluntary system of credit
> reporting, complete information is not always reported to the credit-
> reporting system. Moreover, data accuracy is an issue under any credit-
> reporting system. The accuracy of the data affects both credit scoring and
> judgmental evaluations because both techniques rely on the quality of the
> information included in credit reports. Judgmental underwriting, which
> requires a loan officer's individual attention to an application, provides an
> opportunity to identify inaccuracies that credit scoring does not.

*Id.* at Page 17.

85.    To help address and avoid the specific, negative consequences of continued, negative

reporting by mortgage services (similar to those described in the preceding paragraphs)

that are subject to borrower QWR/NOEs, Congress and the CFPB enacted a specific tool

in the toolbox of rights and remedies in favor of borrowers—i.e 12 U.S.C.A. § 2605(e)(3)

and 12 C.F.R. § 1024.35(i)(1).  In plain language the CFPB explains the protection to the

Plaintiffs and Class members as follows on its website:

Q. Can my mortgage servicer report negative information about me to a credit-
reporting agency after I have sent an error dispute or information request?

> A.  It depends. If your notice of error is in regards to a payment, your
> servicer can't provide negative information about that payment to any
> consumer reporting agency or credit bureau for the 60 days after it receives
> your notice of error.

47

https://www.consumerfinance.gov/ask-cfpb/can-my-mortgage-servicer-report-negative-information-about-me-to-a-credit-reporting-agency-after-i-have-sent-an-error-dispute-or-information-request-en-209/ (last visited September 3, 2019).

**COUNT I: Violations of MARYLAND'S CONSUMER DEBT COLLECTION ACT ("MCDCA"), Com. Law § 14-201, *et seq.*, & MARYLAND'S CONSUMER PROTECTION ACT ("MCPA"), COM. LAW §§ 13-101 *et seq.*
(Against BSI and Brougham)**

86.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein except Plaintiff does not incorporate for this claim any specific facts concerning or related to credit reporting.  Plaintiff also does not seek any damages related to credit reporting for this claim. Plaintiff's relief in this count is solely against Defendants BSI and Brougham.

87.     At all times described herein, Brougham has acted as a collector through its authorized agent, BSI, by attempting to collect upon alleged, invalid debts of Ms. Wilcox arising out of a consumer transaction—her mortgage loan used for personal, consumer purposes related to the Property.  COM. LAW §14-201(b).  Brougham was aware of the CFPB's findings in the Consent Order but recklessly disregarded those findings and continue to retain BSI to act on its behalf, without any consideration of the negative consequences to Ms. Wilcox, and therefore ratified BSI's improper conduct for its own benefit.

88.     In addition, BSI has also acted as collector under the MCDCA by attempting to collect upon alleged, invalid debts of Ms. Wilcox arising out of a consumer transaction—her mortgage loan used for personal, consumer purposes related to the Property.  COM. LAW §14-201(b).

89.     BSI and Brougham have attempted to collect from Ms. Wilcox in manners which violate the terms of documents governing the Loan, their prior Settlement Agreement, and in

48

disregard that Ms. Wilcox has paid all monthly sums actually due and owing from her. Further, BSI has attempted, with Brougham's express authority, to collect from Ms. Wilcox sums not actually owed or ever agreed to by Ms. Wilcox and it knew were in express violation of the documents governing the loan and BSI's prior Settlement Agreement with BSI and .

90.    Maryland's debt collection and mortgage lending laws and the Defendant BSI's and Brougham's duties under Maryland law, do not permit BSI and Brougham to utilize methods and means of collection not permitted by law or the relationship governing the parties.   BSI and Brougham know the law and know that their records related to Ms. Wilcox' Loan are not accurate.   However, each knowingly and recklessly attempted to interfere or otherwise infect Ms. Wilcox's rights on the basis of allegedly owning debts not lawfully due, failing to properly respond to inquiries and performing reasonable investigations, and making false and misleading demands, directly and indirectly, to Ms. Wilcox and others in their knowing and reckless efforts to collect sums not lawfully due from Ms. Wilcox.   By such acts BSI and Brougham have:

   a.   Knowingly and recklessly claimed, attempted, or threatened to enforce rights with knowledge that the rights do not exist, in violation of the MCDCA.   COM LAW §14-202(8).

   b.   Engaged in conduct which violates §§ 804 through 812 of the Federal Fair Debt Collection Practices Act including but not limited to 15 U.S.C. §§ 1692e, § 1692f. COM LAW §14- 202(11).

91.    Ms. Wilcox is therefore entitled to her damages and losses described *supra* which have proximately resulted from BSI's and Brougham's direct and indirect actions in violation of

49

the MCDCA.  COM. LAW, § 14-203.

92.  BSI's and Brougham's violations of the MCDCA are also *per se* violations of the MCPA. COM. LAW § 13-301(14)(iii).

93.  The mortgage loan servicing and collection practices described herein of BSI and Brougham, as set forth herein, are governed by the Maryland Consumer Protection Act ("MCPA"), COM. LAW. § 13-101, *et seq.*

94.  COM. LAW. § 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The mortgage servicing of Plaintiff's Loan serviced by BSI on behalf of Brougham, and the threatened foreclosure/collection and other acts and omissions related to BSI's debt collection practices on behalf of Brougham involves both the extension of credit and the collection of debts.

95.  COM. LAW. § 13-303 also prohibits unfair or deceptive trade practices in the sale or provision of consumer services, such as those provided by BSI and Brougham.

96.  The MCPA defines unfair or deceptive trade practices to include, *inter alia*, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.  COM. LAW §§13-301(1) and (3).

97.  BSI's and Brougham's acts and omissions described herein, and including but not limited to (i) failing to timely and accurately respond to Plaintiff's lawful efforts to mitigate her situation, (ii) seeking and demanding sums not legally or contractually due from Plaintiff or giving her credit for payments made on the Loan, (iii) initiating collection activity by sending default notices to Plaintiff when it knew that no default existed, and (iv) failing to

50

conduct any reasonable investigation of Plaintiff's QWR I and QWR II disputes whatsoever constitute unfair and deceptive trade practices in violation of COM. LAW § 13-301(1)(3) and COM. LAW §§13-303(4)(5).

98.   Plaintiff and others including Sage Title reasonably relied upon the material acts and actions of BSI on behalf of Brougham as exemplified *supra*.  As demonstrated herein (i) she continued to pay BSI in response to and in reliance to its demands that he do so, (ii) she frequently communicated with BSI's authorized representatives about their mortgage and the application of her payments to the Loan and escrow account in response to and in reliance to its requests that she do so, (iii) she notified it of its errors in reliance to and in response to its continued false and deceptive threats and failure to properly credit her payments and addition of fees and costs to her account not owed, and (iv) she incurred costs, legal fees, and expenses to attempt to mitigate the situation but BSI simply disregarded those efforts.   BSI's and Brougham's acts and omissions are simply unreasonable, unfair, abusive, and deceptive—even those acts after this action commenced which demonstrate it simply wishes to avoid any review of its improper mortgage servicing practices.

99.   Had BSI and Brougham not acted unfairly and deceptively, Plaintiff would not have suffered the damages and losses she has as described *supra* (as qualified in ¶ 86).

100.  Plaintiff has pled sufficient facts to put BSI and Brougham on notice as to the claims against each as exemplified *supra* (i.e. dates of key acts and representations of BSI and its agents; and the regulatory and statutory duties of BSI and Brougham which each simply ignored and thereby infected the subject transactions to ensure harm and damage to Ms. Wilcox).

**COUNT II:  VIOLATIONs OF THE REAL ESTATE SETTLEMENT**

51

### PROCEDURES ACT ("RESPA"), 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.36, and
### 12  C.F.R. § 1024.35
### (Against BSI Only)

101.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein.  Plaintiff's relief
in this count is solely against Defendant BSI.

102.    BSI had duty of care under 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.36, and 12 C.F.R. §
1024.35 to acknowledge in writing Plaintiff's QWRs (including notices of error and
requests for information) within five days and to respond to the QWRs after conducting a
reasonable investigation in writing within 30 days (unless it seeks an extension of not more
than 15 days).

103.    Plaintiff's QWRs described herein at ¶¶ 41-43, 46-47 were sent to the address published
by BSI for such communications and BSI received each.

104.    BSI also had duty of care under 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35 to conduct
a reasonable investigation of Plaintiff's QWRs and it failed to do any reasonable
investigation as demonstrated *supra* (*see e.g.* ¶¶ 44-45, 48-49) and including its: (i) failure
to provide the information sought in the QWRs; (ii) lack of any substantive response to
QWR I, and (iii) its pattern of making claims in writing by its authorized representatives
to Ms. Wilcox and third parties which it knew were false and misleading and otherwise
demonstrated that it was relying on factual and legal positions that are not supported by the
law or the Loan documents or otherwise are infected from its own incorrect data.

105.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. §
1024.35(i)(1), BSI also continued to furnish adverse, disputed information to the credit
reporting agency known as TransUnion LLC regarding payments subject to Ms. Wilcox's
QWR/NOE (including that any sums were even due).  It furnished this adverse information

52

on a monthly from March 2019 through June 2019 (which were within sixty days of BSI's receipt of Ms. Wilcox's QWR/NOEs) when it was barred as a matter of law from doing so.

106.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), BSI furnished adverse information to the credit reporting agency known as Equifax Information Services, LLC regarding payments subject to Ms. Wilcox's QWR/NOE (including that any sums were even due).  It furnished this adverse information on a monthly from March 2019 through June 2019 (which were within sixty days of BSI's receipt of Ms. Wilcox's QWR/NOEs) when it was barred as a matter of law from doing so.

107.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), BSI furnished adverse information to the credit reporting agency known as Experian Information Services Inc. regarding payments subject to Ms. Wilcox's QWR/NOE (including that any sums were even due).  It furnished this adverse information on a monthly from March 2019 through June 2019 (which were within sixty days of BSI's receipt of Ms. Wilcox's QWR/NOEs) when it was barred as a matter of law from doing so.

108.    As a direct and proximate result of these violations Plaintiff is entitled to her actual and statutory damages pursuant to 12 U.S.C.A. § 2605(f) described *supra*.

### COUNT III: VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 USC §§ 1681 *et. seq.* (Against BSI)

109.    The preceding allegations of this Complaint are reiterated and incorporated herein by reference as if fully set forth herein.  Plaintiff's relief in this count is solely against Defendant BSI.

110.    The FCRA requires that a furnisher of credit information to the CRAs, such as BSI in this instance, after receiving notice from a credit reporting agency that a consumer disputes

53

information that is being reported by that furnisher, conduct an investigation with respect to the disputed information, to review all relevant information, to report the results of the investigation to the credit reporting agency, and, if the investigation reveals that the information is incomplete or inaccurate, to report those results to all other credit reporting agencies to which the furnisher has provided the inaccurate information.

111.   From April 2019 until the present, BSI has consistently provided inaccurate information to Experian, TransUnion, and Equifax.

112.   Ms. Wilcox disputed the inaccurate information with Experian, Equifax and TransUnion.

113.   Pursuant to the FCRA, Experian, TransUnion, and Equifax each sent the Plaintiff's disputes to the furnisher of the false information--i.e. BSI.  BSI received those notices from the CRAs.

114.   After the Plaintiff sent the dispute letters to the CRAs, and the CRAs sent the dispute letters to BSI, BSI willfully and recklessly "verified" its knowingly false reporting as accurate, even though it knew the Plaintiff was current on her payments and the integrity of its own electronic data systems were found by the CFPB in the Consent Order to be inadequate in the Consent Order, and any default was based on BSI's voluntary and incorrect diversion of Plaintiff's payments towards fees and costs not actually owed.

115.   Even after the Plaintiff's disputes with Experian, TransUnion, and Equifax were received by the CRA Defendants and transmitted by each to BSI, the CRAs continued to report the false and damaging information about the Plaintiff based upon BSI's knowingly and willfully incorrect reporting to them and its failure to conduct a reasonable investigation in response to those disputes.

116.   15 U.S.C. § 1681s-2 prohibits furnishers from reporting inaccurate information and sets

54

forth the furnisher's duty to investigate the completeness and accuracy of the information reported when the furnisher receives a dispute from a consumer.

117.   After receiving notice by Experian, Equifax, and TransUnion, as required by the FCRA, Defendant BSI engaged in conduct that violates 15 USC § 1681s-2(a), (b), by:

    c.   Willfully failing to conduct a reasonable investigation of the inaccurate information that Plaintiff disputed;

    d.   Willfully failing to review all relative information concerning Plaintiff's Loan including the Settlement Agreement it has in its possession and control related to the Loan and the dispute.

    e.   Willfully failing to report the results of investigations to Experian, TransUnion, and Equifax;

    f.   Willfully failing to report an accurate status of the inaccurate information to Experian, TransUnion, and Equifax;

    g.   Willfully failing to properly participate, investigate and comply with the reinvestigations that were conducted by any and all credit reporting agencies concerning the inaccurate information disputed by Plaintiff;

    h.   Willfully continuing to furnish and disseminate inaccurate and derogatory credit, account and other information concerning Plaintiff to the credit reporting agencies that it knew was found in its Consent Order with the CFPB to be defective; and

    i.   Willfully failing to comply with the requirements imposed on furnishers of information pursuant to 15 USC § 1681s-2(a), (b).

118.   In the alternative, the violations in ¶ 116 a – i were negligent rather than willful.

119.   Defendant BSI's conduct was a direct and proximate cause, as well as a substantial factor,

in causing serious injuries, damages and harm to Plaintiff that are outlined above, and as a result, BSI is liable to compensate Plaintiff for the full amount of statutory, actual and punitive damages, along with attorney's fees and costs, as well as other such relief permitted by the FCRA.

120.   As a result of the conduct, action, and inaction of BSI, Ms. Wilcox suffered damages and losses of credit, loss of the ability to purchase and benefit from credit at his phase of life when she is likely to need it to purchase a new place to live, the mental and emotional pain and anguish, frustration, anxiety, and the humiliation and embarrassment of available credit only at less than market rates—even though she has worked hard to consistently pay her bills and obligations on-time and has not overextended himself.

121.   BSI's conduct, action, and inaction was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling Ms. Wilcox to recover under 15 U.S.C. § 1681o.

122.   Ms. Wilcox is entitled to recover costs and attorney's fees from BSI in an amount to be determined by the Court pursuant to 15 U.S.C. 1681n and or § 1681o.

## COUNT IV: BREACH OF SETTLEMENT AGREEMENT
### (Against BSI and Brougham)

123.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein except Plaintiff does not incorporate for this claim any specific facts concerning or related to credit reporting.  Plaintiff also does not seek any damages related to credit reporting for this claim. Plaintiff's relief in this count is solely against Defendants BSI and Brougham.

124.   Ms. Wilcox, Brougham, and BSI entered into a binding contract—i.e. a Settlement Agreement—to resolve their dispute related to the Prior Litigation.

125. Ms. Wilcox accepted Brougham and BSI's offer in good faith and consented to a Local Rule 111 dismissal of her then pending claims in the Prior Litigation.  Thereafter, the Settlement Agreement was memooriatized to specify the terms and conditions of the Parties' agreement.

126. Brogham and BSI have materially breached the terms of the Settlement Agreement that they entered into with Ms. Wilcox in November 2018 and thereafter claimed sums were due from Ms. Wilcox (and actually collected sums of money for that purpose) which were specifically identified in the Settlement Agreement as the responsibility of Brougham and BSI and not Ms. Wilcox.  Such action was also also taken in express violation of the Rule 111 Order entered by this Court in the Prior Action.

127. Ms. Wilcox has suffered damages as a result of Brougham and BSI's breaches of the Settlement Agreement as described herein.

### COUNT V: VIOLATION OF THE MARYLAND MORTGAGE FRAUD PROTECTION ACT, REAL PROP. §§ 7-401, *et seq.*
### (Against BSI)

128. Plaintiff incorporates all preceding paragraphs as if set forth fully herein except Plaintiff does not incorporate for this claim any specific facts concerning or related to credit reporting.  Plaintiff also does not seek any damages related to credit reporting for this claim. Plaintiff's relief in this count is solely against Defendant BSI.

129. The Maryland Mortgage Fraud Protection Act ("MMFPA"), REAL PROP. § 7-401, *et. seq.*, governs the relationship between Plaintiff and BSI.

130. REAL PROP. § 7-401(c) provides: "Homeowner" means a record owner of residential real property. The Plaintiff was the record owner of the property in question and is therefore a Homeowner entitled to the protections of the MMFPA.

131.  REAL PROP. § 7-401(e) provides: "Mortgage lending process… include[s] [t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan."

132.  The MMFPA works to protect the interests of all parties to mortgage transactions in Maryland from misstatements, misrepresentations and omissions. In this instance, the MMFPA works to protect borrowers like Plaintiff from so-called professionals like BSI to ensure a level, fair playing field between all borrowers and professionals.  For example, other mortgage professionals who followed the duties and responsibilities described herein are harmed BSI's violations and false statements and omissions made herein just as the Plaintiff is harmed.

133.  Plaintiff was a homeowner in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the negotiation and servicing of the Loan.

134.  REAL PROP. § 7-401(d) provides: "Mortgage fraud" means any action by a person made with the intent to defraud that involves:

> (1) Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;
>
> (2)  Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.
>
> (3)  Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;
>
> (4) Conspiring to violate any provisions of item (1), (2), or (3) of this section…

58

135. BSI's knowing conduct and intention to defraud Plaintiff is demonstrated by its dishonest and untrue statements (*see e.g.* ¶¶ 10, 17-18, 37, 39, 44, 47, 50, 64, and 69), omissions (*see e.g.* ¶¶ 10, 37, 39, 43-44, 49-50, and 64), admissions in its <u>Consent Order</u> with the CFPB, and willful refusal to know the true facts (*see e.g.* ¶¶ 10, 18, 37, 43-45, 47, and 64).

136. As a result of BSI's knowingly deceptive and untrue communications and misstatements and omissions and acts and omissions in the mortgage lending process, Plaintiff has suffered economic and noneconomic damages described *supra*.

### COUNT VI: VIOLATION OF THE FAIR CREDIT REPORTING ACT (FCRA)
### (AGAINST EQUIFAX ONLY)

137. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.  Plaintiff's relief in this count is solely against Defendant Equifax.

138. Information regarding the Prior Litigation between Wilcox, BSI, and Brougham is public and accessible by Equifax.  Information regarding BSI's <u>Consent Order</u> with the CFPB is also public and accessible by Equifax.

139. Equifax violated 15 U.S.C. §1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it maintains and published concerning Ms. Wilcox.

140. Equifax violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Ms. Wilcox's credit files after receiving actual and record notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to maintain reasonable procedures with which to filter and verify disputed information in Ms. Wilcox's credit file; and by relying upon verification from a source it has reason to know is unreliable.

141. As a result of the conduct, action, and inaction of Equifax, Ms. Wilcox suffered damages

and losses of credit, loss of the ability to purchase and benefit from credit, the mental and emotional pain and anguish and the humiliation and embarrassment of available credit only at less than market rates—even though she has always paid all her bills and obligations on-time and she has overextended herself.

142.   Equifax's conduct, action, and inaction was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling Ms. Wilcox to recover under 15 U.S.C. § 1681o.

143.   Ms. Wilcox is also entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. 1681n and or § 1681o.

### COUNT VII: VIOLATION OF THE FAIR CREDIT REPORTING ACT (FCRA)
### (AGAINST EXPERIAN ONLY)

144.   Plaintiff incorporates all preceding paragraphs as if set forth fully herein.  Plaintiff's relief in this count is solely against Defendant Experian.

145.   Information regarding the Prior Litigation between Wilcox, BSI, and Brougham is public and accessible by Experian.  Information regarding BSI's Consent Order with the CFPB is also public and accessible by Experian.

146.   Experian violated 15 U.S.C. §1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it maintains and published concerning Ms. Wilcox.

147.   Experian violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Ms. Wilcox's credit files after receiving actual and record notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to maintain reasonable procedures with which to filter and verify disputed information in Ms. Wilcox's credit file; and by relying

upon verification from a source it has reason to know is unreliable.

148.    As a result of the conduct, action, and inaction of Experian, Ms. Wilcox suffered damages

and losses of credit, loss of the ability to purchase and benefit from credit, the mental and

emotional pain and anguish and the humiliation and embarrassment of available credit only

at less than market rates—even though she has always paid all her bills and obligations on-

time and she has overextended herself.

149.    Experian's conduct, action, and inaction was willful, rendering it liable for punitive

damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In

the alternative, it was negligent, entitling Ms. Wilcox to recover under 15 U.S.C. § 1681o.

150.    Ms. Wilcox is also entitled to recover costs and attorney's fees from Experian in an amount

to be determined by the Court pursuant to 15 U.S.C. 1681n and or § 1681o.

**COUNT VIII: VIOLATION OF THE FAIR CREDIT REPORTING ACT (FCRA)**
**(AGAINST TRANS UNION ONLY)**

151.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein.  Plaintiff's relief

in this count is solely against Defendant Trans Union.

152.    Information regarding the Prior Litigation between Wilcox, BSI, and Brougham is public

and accessible by Trans Union.  Information regarding BSI's Consent Order with the CFPB

is also public and accessible by Trans Union.

153.    Trans Union violated 15 U.S.C. §1681e(b) by failing to establish or to follow reasonable

procedures to assure maximum possible accuracy in the preparation of the credit report and

credit files it maintains and published concerning Ms. Wilcox.

154.    Trans Union violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Ms.

Wilcox's credit files after receiving actual and record notice of such inaccuracies; by failing

to conduct a lawful reinvestigation; by failing to maintain reasonable procedures with which to filter and verify disputed information in Ms. Wilcox's credit file; and by relying upon verification from a source it has reason to know is unreliable.

155.   As a result of the conduct, action, and inaction of Trans Union, Ms. Wilcox suffered damages and losses of credit, loss of the ability to purchase and benefit from credit, the mental and emotional pain and anguish and the humiliation and embarrassment of available credit only at less than market rates—even though she has always paid all her bills and obligations on-time and she has overextended herself.

156.   Trans Union's conduct, action, and inaction was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent, entitling Ms. Wilcox to recover under 15 U.S.C. § 1681o.

157.   Ms. Wilcox is also entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. 1681n and or § 1681o.

## PRAYER FOR RELIEF

A.   WHEREFORE, Ms. Wilcox respectfully requests the Court enter a money judgment pursuant to Counts I and IV, under the MCDCA, MCPA, and common law breach of contract, in her favor and against Defendants BSI and Brougham in a sum in excess of $75,000 for actual damages.

B.   WHEREFORE, Ms. Wilcox respectfully requests the Court enter a money judgment pursuant to Counts II, III, and V, under the RESPA (and Regulation X), FCRA, and MMFPA, in her favor and against Defendant BSI in a sum in excess of $75,000 for actual and statutory damages (including statutory punitive damages under the FCRA and statutory treble damages under the MMFPA).

C.  WHEREFORE, Ms. Wilcox respectfully requests the Court to also enter a money judgment pursuant to Counts I, II, III, and V, under the MCPA, RESPA (and Regulation X), FCRA, and MMFPA, in her favor and against Defendants BSI and/or Brougham for an additional sum for reasonable attorney fees and costs permitted under each statutory claim.

D.  WHEREFORE, Ms. Wilcox respectfully requests the Court enter a money judgment pursuant to Count VI under the FCRA in her favor and against Defendant Equifax for compensatory damages and punitive damages equal to $38,000 to be determined by the Court in a sum permitted by the Court pursuant to 15 USC § 1681n.

E.  WHEREFORE, Ms. Wilcox respectfully requests the Court enter a money judgment pursuant to Count VII under the FCRA in her favor and against Defendant Experian for compensatory damages and punitive damages equal to $38,000 to be determined by the Court in a sum permitted by the Court pursuant to 15 USC § 1681n.

F.  WHEREFORE, Ms. Wilcox respectfully requests the Court enter a money judgment pursuant to Count VII under the FCRA in her favor and against Defendant Trans Union for compensatory damages and punitive damages equal to $38,000 to be determined by the Court in a sum permitted by the Court pursuant to 15 USC § 1681n.

G.  WHEREFORE, Ms. Wilcox respectfully requests such other and further relief as this court finds necessary and proper.

Respectfully Submitted,
*//s//Phillip R. Robinson*
Phillip R. Robinson
   Bar No. 27824
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD  20910
Phone (301) 448-1304
phillip@marylandconsumer.com
